AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT
for the
Southern District of California

In the Matter of the Search of )
Blue OnePlus brand cellular telephone bearing IMEI 862812060964181 and SIM card in plastic baggie seized under San Diego Sheriff's Department case 23116828 and assigned San Diego Sheriff's Department barcode number S0540092; and SanDisk 32 gb microSD card in plastic baggie seized under San Diego Sheriff's Department case 23116828 and assigned San Diego Sheriff's Department barcode number S0540093 )
)
)
)
)
)

Case No.  '23  MJ3916

**APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS**

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, incorporated herein by reference.

located in the ___Southern___ District of ___California___, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21, USC sec. 841 | Distribution of Controlled Substances |

The application is based on these facts:
See Attached Affidavit of FBI Special Agent Matthew R. Aday, incorporated herein by reference.

☑ Continued on the attached sheet.

☐ Delayed notice of ____ days *(give exact ending date if more than 30 days:* ____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Matt R Aday*
*Applicant's signature*

Special Agent Matthew R. Aday, FBI
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by ___telephone___ *(specify reliable electronic means)*.

*Mitchell D. Dembin*
*Judge's signature*

Date: 10/27/2023

City and state: San Diego, California

Hon. Mitchell D. Dembin, U.S. Magistrate Judge
*Printed name and title*

# AFFIDAVIT

I, Matthew R. Aday, being duly sworn, hereby state as follows:

## INTRODUCTION

1. This affidavit supports an application for a warrant to search the following cellular telephone:

> Blue OnePlus brand cellular telephone bearing IMEI 862812060964181 and SIM card in plastic baggie seized under San Diego Sheriff's Department case 23116828 and assigned San Diego Sheriff's Department barcode number S0540092; and SanDisk 32 gb microSD card in plastic baggie seized under San Diego Sheriff's Department case 23116828 and assigned San Diego Sheriff's Department barcode number S0540093; collectively, the "**Target Device**"

and seize evidence of crimes, specifically, violations of Title 21, United States Code, Section 841 (Distribution of Controlled Substances) (hereafter, the "Target Offense"), as described in Attachment B. The **Target Device** was seized incident to the search of a vehicle believed to be utilized by Joe LEWIS (hereafter, "LEWIS"). The **Target Device** is believed to have been used by LEWIS to coordinate offenses in San Diego and will contain evidence of the Target Offense. A factual explanation supporting probable cause follows. The **Target Device** is currently in the custody of the San Diego Sheriff's Department located at 5590 Overland Avenue, San Diego CA 92123.

2. The information contained in this affidavit is based upon my experience and training, consultation with other federal, state, and local law enforcement agents. Because this affidavit is made for the limited purpose of obtaining a search warrant for the **Target Device**, it does not contain all of the information known by me or other federal agents regarding this investigation, but only contains those facts believed to be necessary to establish probable cause. Dates and times are approximate.

## EXPERIENCE AND TRAINING

3. I am an investigative or law enforcement officer within the meaning of Title 18, United States Code, Section 2510(7); that is, an officer of the United States who is

1

empowered by law to conduct investigations of and to make arrests for offenses enumerated in Title 18, United States Code, Section 2516.

4. I am a Special Agent with the FBI and have been so employed since June 2021. I am currently assigned to the East County Regional Gang Task Force (hereinafter, "ECRGTF") of the San Diego Field Office where I investigate various crimes that include, but are not limited to, drug trafficking, weapons trafficking, homicides, and other gang-related violent crime.

5. Prior to my assignment to the ECRGTF, I completed approximately eighteen weeks of training at the FBI Academy in Quantico, Virginia. During the training, I received instruction in a variety of investigative techniques commonly used in support of a wide range of the FBI's investigative priorities. The training included instruction regarding the use of confidential human sources, electronic and physical surveillance techniques, law enforcement tactics, search and seizure laws and techniques, interviewing strategies and skills, and a variety of other subjects.

6. Since joining the ECRGTF, I have conducted surveillance in numerous narcotics and firearms offenses. I have debriefed numerous current and former drug traffickers and gang members who participated in drug trafficking. From these debriefs and my conversations with experienced narcotics investigations, I have learned that narcotics traffickers communicate and coordinate their illicit activities through the use of cellular telephones, including utilizing prepaid calling cards, direct connect (radio-to-radio), texting capabilities, and through the use of various phone applications. I also know that narcotics traffickers often change phones as a means to evade detection by law enforcement. Moreover, I know that narcotics traffickers often get phones from third parties and/or subscribe to them in fictitious names in order to mask the true identities of the individuals using the phones.

7. Based upon my training and experience as an FBI Special Agent, and consultations with law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I submit the

following:

a. Drug traffickers will use cellular/mobile telephones because they are mobile and they have instant access to telephone calls, text, web, and voice messages.

b. Drug traffickers will use cellular/mobile telephones because they are able to actively monitor the progress of their illegal cargo while the conveyance is in transit.

c. Drug traffickers and their accomplices will use cellular/mobile telephones because they can easily arrange and/or determine what time their illegal cargo will arrive at predetermined locations.

d. Drug traffickers will use cellular/mobile telephones to direct drivers to synchronize an exact drop off and/or pick up time of their illegal cargo.

e. Drug traffickers will use cellular/mobile telephones to notify or warn their accomplices of law enforcement activity to include the presence and posture of marked and unmarked units, as well as the operational status of checkpoints and border crossings.

f. Drug traffickers and their co-conspirators often use cellular/mobile telephones to communicate with load drivers who transport their narcotics and/or drug proceeds.

g. Drug traffickers and their co-conspirators often use portable Wi-Fi/hotspot devices. Wi-Fi hotspots are internet access points that allow the Drug traffickers to connect to a Wi-Fi network, which are "pocket-sized" mobile routers that allow the connection to the internet, via Wi-Fi. This allows the traffickers to make phone calls, via Wi-Fi from anywhere, and limit their personal/identifying data to be detected.

h. The use of cellular telephones by conspirators or drug traffickers tends to generate evidence that is stored on the cellular telephones, including, but not limited to emails, text messages, photographs, audio files, videos, call logs, address book entries, IP addresses, social network data, and location data.

8. Based upon my training and experience as an FBI Special Agent, and consultations with law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I know that cellular/mobile telephones can and often do contain electronic records, phone logs and

3

contacts, voice and text communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data. This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular/mobile telephone. Specifically, I know based upon my training, education, and experience investigating these conspiracies that searches of cellular/mobile telephones yields evidence:

a. tending to indicate efforts to distribute federally controlled substances within the United States;

b. tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate the distribution of federally controlled substances within the United States;

c. tending to identify co-conspirators, criminal associates, or others involved in the distribution of federally controlled substances within the United States;

d. tending to identify travel to or presence at locations involved in the distribution of federally controlled substances within the United States, such as stash houses, load houses, or delivery points;

e. tending to identify the user of, or persons with control over or access to, the **Target Devices**; and/or tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

## FACTS SUPPORTING PROBABLE CAUSE
*Background of Investigation*

9. The FBI and the ECRGTF are investigating LEWIS, a documented member of the Spring Valley Locos criminal street gang (hereafter "SVLS"). The documented SVLS gang association is derived from prior law enforcement encounters and field interviews.[1]

---

[1] On April 19, 2021, while incarcerated, LEWIS received an email from another SVLS member making references to the "Spring Valley Locos." The sender made it clear that he was emailing active members within the gang. Additionally, according to San Diego County's Electronic Justice Management System, LEWIS possesses a gang flag as a member for the Spring Valley Locos.

4

SVLS are a predominantly Hispanic criminal street gang which operates in the unincorporated San Diego County neighborhood of Spring Valley, CA. SVLS members regularly participate in weapons trafficking, robberies, and narcotics trafficking. SVLS is responsible for paying dues or "taxes", which ultimately gets received by the Mexican Mafia. The Mexican Mafia is a Hispanic prison gang which started in the California Department of Corrections in the 1950s. They currently have approximately 200 made members and thousands of subordinate southern California Hispanic street gang members known as "Surenos."

*Stolen Vehicle*

10. On April 23, 2023, San Diego Sheriff's Department (hereafter, "SDSD") Deputy Trevor Karsh was working a regularly scheduled patrol shift within the County of San Diego when a black Honda Civic (hereafter, "V1") drove past him, driver door to driver door. Deputy Karsh observed and described the driver of V1 as a Hispanic male in his mid to late 20's wearing a light-colored shirt. After passing Deputy Karsh, V1 was observed driving erratically into a parking lot located at 415 Grand Avenue, Spring Valley, California ("the Grand Avenue lot"). As Deputy Karsh drove towards V1 to read the license plate, the driver of V1, an unidentified male wearing dark pants or long shorts, exited, and fled on foot. As Deputy Karsh continued to approach V1, an unidentified female passenger exited V1, walked to the driver's side of V1, and turned V1 off. When asked why the unidentified male fled on foot, the unidentified female responded, "I don't know, that is not my car." The unidentified female proceeded to walk away from V1.

11. V1 was bearing California license plate 3SWM24. The last four digits of the VIN was not a match to the license plate, leading Deputy Karsh to believe V1 was stolen. According to law enforcement database checks, California license plate 3SWM24 was reported stolen on April 20, 2023 (San Diego Police Department Case #23016707.) After further investigating, Deputy Karsh learned that V1 (assigned California license plate 4GOF096) was reported stolen on April 17, 2023 (San Diego Police Department Case

#20230821.)

### Identification of Joe Lewis

12. During the search of V1, a black backpack was located directly behind the center console. The backpack had written on the inside, "SVLS X3" and "BULLY." Investigators know "SVLS X3" to be symbols and acronyms associated to the SVLS criminal street gang. Additionally, investigators know "BULLY" to be a moniker for LEWIS.[2] Based on the information, Deputy Karsh accessed LEWIS' booking photograph from 2021 via a law enforcement database, and recognized LEWIS as the male driving V1.

13. The unidentified female was eventually located and provided her name as Alexandra GILSTRAP (hereafter, "GILSTRAP").[3] After being advised of her Miranda Rights, GILSTRAP was interviewed and stated that she was hanging out with LEWIS but did not know V1 was stolen. Additionally, GILSTRAP stated that she did not know why LEWIS ran away from V1, but agreed that in the given situation, a logical person would think V1 was stolen. GILSTRAP was placed under arrest for 496d(a) PC (Possession of a Stolen Vehicle.)

14. A search of the backpack revealed a blue OnePlus-brand cellular phone, a SIM card, a 32 gb SanDisk microSD card (collectively, **Target Device**); one driver's license for an unknown individual, debit or credit cards for seven unknown individuals, and several ingnition keys from multiple vehicle manufacturers, as shown in the photos below.

---

[2] On February 21, 2021, LEWIS was arrested in Spring Valley, California for being in possession of a stolen vehicle and two felony warrants. LEWIS was in possession of a cell phone seized during the arrest. During a search of the cell phone, numerous SVLS related photographs were located. Additionally, numerous text messages were discovered in which LEWIS introduces himself as "Me BULLY Vs" and "Bully."

[3] The identification of GILSTRAP was confirmed via a previous booking photograph of GILSTRAP.

6



The vehicle ignition keys; blue OnePlus cellular telephone, plastic baggie containing a SIM card and 32 gb SanDisk microSD card (collectively, **Target Device**); one driver's license for an unknown individual and debit or credit cards for seven unknown individuals found in the black backpack that was located directly behind the center console of V1.



Closeup of the IMEI for the blue OnePlus cellular telephone found in the black backpack that was located directly behind the center console of V1.

//
//
//
//
//
//
//
//



Closeup of the contents of the plastic baggie containing the SIM card and SanDisk 32 gb microSD card, along with a SIM card tray and SIM card ejection tool, found in the black backpack located directly behind the center console of V1.

15. The International Mobile Equipment Identifier (IMEI) for the blue OnePlus brand cellular phone was researched using an open source tool that identified the phone model as a Nord N200 5G. Per specifications listed on the OnePlus website, the Nord N200 5G model has ports for a physical SIM card and an external microSD memory card.

*Discovery of Firearm, Ammunition, and Narcotics*

16. On the same day, the residents of a property on Paraiso Avenue, Spring Valley, California ("the Paraiso Avenue residence"), called law enforcement to report finding a black bag that contained a handgun in their backyard. Deputies retrieved the black bag from the Paraiso Avenue residence, which was later identified as a Lulu Lemon "fanny pack." Inside of the fanny pack Deputies located a gray and silver handgun with no serial number that contained a magazine carrying ten rounds of 9mm ammunition. In another pouch of

the fanny pack, Deputies located nine additional rounds of 9mm ammunition. Also found inside of the main pouch of the fanny pack were two small baggies containing a clear crystalline substance and a fine white powdery substance.

17. The nineteen rounds of ammunition found inside the fanny pack were manufactured by a variety of manufacturers, to include: Winchester, Remington, Prvi Partizan, Federal, Speer, and Blazer. None of these manufacturers contain manufacturing facilities in California. Therefore, the nineteen rounds of ammunition had been shipped or traveled from within one state to another state.

18. One of the residents of the Paraiso Avenue residence informed Deputies that he/she saw an individual wearing all black run past the southeast corner from the window. The individual placed a chair behind their fence to assist in jumping into the front yard.

19. Additionally, a witness that directed Deputies to the backyard of the Paraiso Avenue residence informed them that he/she saw a male run from the Grand Avenue lot to the backyard of the Paraiso Avenue residence, where he jumped over the fence. The Grand Avenue lot is located across an alley from the Paraiso Avenue residence.

*Controlled Substance Testing*

20. Later that day, utilizing a TruNarc device, Deputy Karsh tested the two small baggies of substance for narcotics. The crystalline substance tested positive for methamphetamine and the white powdery substance tested positive for fentanyl. The gross weight of the methamphetamine was 1.36 grams[4] and the gross weight of the fentanyl was 3.25 grams[5].

---

[4] I am aware from my training, experience, and conversations with other investigators that roughly 0.05 to 0.10 grams of methamphetamine is considered a dosage depending on the unique tolerance of the user and the purity of the methamphetamine. Thus, the 1.36 grams of methamphetamine would be the equivalent of anywhere between roughly 13 and 27 doses depending on the aforementioned factors.

[5] I am aware from my training, experience, and conversations with other investigators that roughly 1 milligram of fentanyl is considered a dosage that will keep the user under the influence of the narcotic for 2-4 hours. 3.25 grams of fentanyl, therefore, is approximately 3250 doses, or enough fentanyl to keep 3250 individuals under the influence of fentanyl for 2-4 hours.

### *Lewis's Criminal History*

21. Investigators learned that LEWIS has approximately seven prior felony convictions including a 2020 conviction for a violation of California Penal Code 30305(A)(1), Possession of Ammunition or Reloaded Ammunition by a Prohibited Person.

### *Search of the Target Device*

22. On October 5, 2023, investigators began reviewing the digital contents extracted from the **Target Device,** pursuant to a search warrant issued on August 31, 2023 by the Honorable William V. Gallo for evidence of evidence of violations of Title 18, United States Code, Section 922(g) (Felon in Possession of a Firearm or Ammunition), Title 18, United States Code, Title 18, United States Code, Section 1028 (Fraud in Connection with Identification Documents), Title 18, United States Code, Section 1343 (Wire Fraud), and Title 15, United States Code, Section 1644 (Fraudulent Use of Credit Cards).

23. In the course of that review for the content authorized by the August 31, 2023 search warrant, investigators observed a Facebook Messenger thread in which an unidentified individual sent a message on April 9, 2023 to LEWIS's Facebook Messenger account asking LEWIS for "white"[6]. LEWIS subsequently implied to the unknown individual that LEWIS would attempt to fulfill the request. Upon observing that thread, investigators terminated any further review of the **Target Device** at that time in favor of seeking an additional warrant encompassing the instant violation.

### *Summary*

24. Based on the investigation to date, including the facts detailed above, investigators believe that LEWIS perpetrated the vehicle theft of V1, fled from law enforcement officers, and was in possession of a firearm, ammunition, controlled substances, and fraudulent personal identification information and credit or debit cards. Investigators also believe that LEWIS was engaged in the distribution of controlled

---

[6] I am aware from my training, experience, and conversations with other investigators that "white" is street slang for methamphetamine.

10

substances. These beliefs are based, in part, on the following: V1 being reported stolen on April 17, 2023; California license plate 3SWM24 being reported stolen on April 20, 2023; Deputy Karsh observing V1 bear California license plate 3SWM24 on April 23, 2023; the SVLS acronym and known moniker "BULLY" being written on the backpack located inside V1; the contents of the backpack including the **Target Device**, numerous vehicle ignition keys, a driver's license for an unknown individual, and credit or debit cards for seven unknown individuals; GILSTRAP stating she was with LEWIS; a witness stating he/she saw a male run from the Grand Avenue lot, the same location a male fled from V1, to the backyard of the Paraiso Avenue residence; a handgun, magazine, ammunition, and controlled substances being located in the backyard of the Paraiso Avenue residence; the residents of the Paraiso Avenue residence stating they saw an individual jump their fence; and the messaging thread observed during the October 5, 2023 review of the digital contents of the **Target Device**.[7]

25. I also know that recent calls made and received, telephone numbers, contact names, electronic mail (e-mail) addresses, appointment dates, text messages, pictures and other digital information are stored in the memory of the **Target Device** which may identify other persons involved in the Target Offenses. Accordingly, based upon my experience and training, consultation with other law enforcement officers experienced in narcotics and firearms trafficking investigations as well as financial fraud, and all the facts and opinions set forth in this affidavit, I believe that information relevant to the Target Offenses such as telephone numbers, made and received calls, contact names, electronic mail (e-mail) addresses, appointment dates, messages, pictures, audio files, videos and other digital information are stored in the memory of the **Target Device**.

## METHODOLOGY

26. It is not possible to determine, merely by knowing the cellular/mobile

---

[7] On July 21, 2023, a criminal complaint was filed in the Southern District of California charging LEWIS with violations of Title 18, United States Code, Section 922(g) (Felon in Possession of a Firearm or Ammunition) and Title 18, United States Code, Section 1028(a)(7) (Fraud and Related Activity in Connection with Identification Documents).

11

telephone's make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device. Cellular/mobile devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular/mobile service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many cellular/mobile telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular/mobile telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

27. Following the issuance of this warrant, I will collect the subject cellular/mobile telephone and subject it to analysis. All forensic analysis of the data contained within the telephone and its memory cards will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

28. Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within ninety (90) days, absent further application to this court.

## PRIOR ATTEMPTS TO OBTAIN THIS EVIDENCE

29. The United States is not aware of any prior attempts to obtain the evidence sought in this warrant.

## CONCLUSION

30. Based on all of the facts and circumstances described above, there is probable cause to conclude that LEWIS used the **Target Device** to facilitate violations of the Target Offense.

31. Because the **Target Device** was promptly seized following the pursuit of LEWIS and has been securely stored, there is probable cause to believe that evidence of illegal activities committed by LEWIS continues to exist on the **Target Device**. As stated above, I believe that evidence of the Target Offense will cover the time period from March 23, 2023 through April 23, 2023.

WHEREFORE, I request that the court issue warrants authorizing law enforcement agents and/or other federal and state law enforcement officers to search the property described in Attachment A and the seizure of items listed in Attachment B, using the methodology described above.

*Matt R Aday*
Matthew R. Aday
Special Agent
Federal Bureau of Investigation

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this 27th day of October, 2023.

_____
The Honorable Mitchell D. Dembin
United States Magistrate Judge

# ATTACHMENT A

## PROPERTY TO BE SEARCHED

The following property is to be searched:

> Blue OnePlus brand cellular telephone bearing IMEI 862812060964181 and SIM card in plastic baggie seized under San Diego Sheriff's Department case 23116828 and assigned San Diego Sheriff's Department barcode number S0540092; and SanDisk 32 gb microSD card in plastic baggie seized under San Diego Sheriff's Department case 23116828 and assigned San Diego Sheriff's Department barcode number S0540093

collectively, the **Target Device**, was seized from a black backpack found in a black Honda Civic bearing CA license plate 3SWM24. **Target Device** is currently in the custody of the San Diego Sheriff's Department at 5590 Overland Avenue, San Diego CA 92123.

## ATTACHMENT B

### ITEMS TO BE SEIZED

Authorization to search the **Target Device** described in Attachment A includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular/mobile devices for evidence described below. The seizure and search of the cellular/mobile devices shall follow the search methodology described in the affidavit submitted in support of the warrant.

The evidence to be seized from the cellular/mobile device will be electronic records, communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data, for the period of March 23, 2023 to and including April 23, 2023:

a. tending to indicate efforts to distribute federally controlled substances within the United States;

b. tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate the distribution of federally controlled substances within the United States;

c. tending to identify co-conspirators, criminal associates, or others involved in the distribution of federally controlled substances within the United States;

d. tending to identify travel to or presence at locations involved in the distribution of federally controlled substances within the United States, such as stash houses, load houses, or delivery points;

e. tending to identify the user of, or persons with control over or access to, the **Target Devices**; and/or tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

which are evidence of violations of Title 21, United States Code, Section 841 (Distribution of Controlled Substances).